**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 04-20046-CR-UNGARO**
**CASE NO. 04-20136-CR-UNGARO**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**MARITZA VALIENTE,**

      **Defendant.**

_____/

**REPORT AND RECOMMENDATION THAT**
**DEFENDANT'S MOTIONS TO DISMISS BE DENIED**

      Presently pending before the Court are Defendant's Motions to Dismiss the Indictments in Case No. 04-20046-CR-UNGARO (DE # 109) and Case No. 04-20136-CR-UNGARO (DE # 22).[1]  These motions are referred to the undersigned Magistrate Judge (04-CR-20046, DE # 112).  The government filed a Response (04-CR-20046, DE # 115; 04-CR-20136, DE # 23), and an evidentiary hearing was held before the undersigned Magistrate Judge on February 20, 2009.  Following the hearing, Defendant filed a Supplemental Brief (04-CR-20046, DE # 120; 04-CR-20136, DE # 28) and the government filed a Supplemental Response (04-CR-20046, DE # 123).  Based upon a careful review of the record, and for the reasons stated herein, the undersigned recommends that Defendant's Motions to Dismiss (04-CR-20046, DE # 109; 04-CR-20136, DE # 22) be **DENIED**.

_____

[1]  The identical motion was filed in both cases.

I.      **BACKGROUND**

A.  **The Fraudulent Income Tax Return Case**

On January 22, 2004, Defendant Maritza Valiente was indicted in Case No. 04-20046-CR-UNGARO for allegedly committing several offenses related to the submission of fraudulent claims for income tax returns.  Specifically, the Indictment alleges that she and co-defendants Eda Felix and Esther Rivera conspired to defraud the Internal Revenue Service between January 2000 and July 2000, by obtaining, and assisting others to obtain, fraudulent income tax refunds, in violation of 18 U.S.C. §§ 287 and 286; (Count 1); and, that she and co-defendants Ela Melendez and Esther Rivera engaged in a similar conspiracy during this time (Count 2).  In addition, Defendant Valiente is charged in nine substantive counts, together with designated co-defendants, with making false claims for income tax refunds as to nine specified taxpayers, between February 26, 2000 and May 1, 2000, in violation of 18 U.S.C. §§ 287 and 2 (Counts 3 - 9; 11-12) (DE # 3).  The Indictment alleges that defendant Maritza Valiente owned and operated United Mortgage Financing, Inc., a business which never engaged in any business activity and had no employees (DE # 3 at 1, ¶ 1).  Co-defendants Eda Felix and Ela Melendez owned and operated businesses engaged in tax return preparation and related services (DE # 3 at 1-2, ¶¶ 2, 4).  Co-defendant Esther Rivera was an employee of the business owned by co-defendant Felix (DE # 3 at 2, ¶ 3).  The Indictment alleges that the defendants recruited individuals for whom they filed income tax returns in which those persons falsely claimed that they were entitled to tax refunds based upon their employment by United Mortgage, when, in fact, they had not been so employed (DE # 3 at 4, ¶ 4; and at 5, ¶ 4). In addition, the Indictment alleges that the income tax returns also falsely stated the number of dependents claimed on those returns (DE # 3 at 3, ¶ 5; and at 5, ¶ 5).

2

Co-defendants Melendez, Rivera and Felix were arrested in January 2004, and by May 7, 2004, they all had entered guilty pleas to the conspiracy charges in the Indictment (DE ## 44, 50, 53).

### B. The False Passport Application Case

On March 4, 2004, Defendant was indicted in Case No. 04-20136-CR-UNGARO for allegedly making false statements in connection with her application for a United States passport on April 2, 1999 (DE # 1).  Specifically, the Indictment alleges that Defendant falsely stated in the application that her name was "Nancy Noemi Nazario," and that she was born in Caguas, Puerto Rico, in violation of 18 U.S.C. § 1542 (Count 1); and that on that same date, she falsely represented herself as a United States citizen by presenting a birth certificate from Caguas, Puerto Rico as proof of her identity in order to secure the issuance of a passport, in violation of 18 U.S.C. § 911 (Count 2).

### C. The Presently Pending Motions to Dismiss

Defendant Valiente requests the Court to dismiss the Indictments based on her contention that the government violated her right to a speedy trial under the Sixth Amendment because the Indictments were based on alleged criminal activity that occurred in between 1999 and 2000; the Indictments were not filed until 2004; and, she was not arrested and brought before the Court for her initial appearance until November 2008 (DE # 109).[2]  Defendant claims that the length of the delay is presumptively

---

[2]  Defendant initially argued in her briefs that dismissal was proper because the four-year delay between the commission of the allegedly illegal acts and the filing of the Indictment violated her Fifth Amendment Due Process rights.  However, as discussed in more detail below, Defendant conceded that it was not appropriate to dismiss the Indictments based solely on the pre-indictment delay, because the Indictments were filed within the time permitted by the applicable statutes of limitations; the government did not delay filing the Indictments for the purpose of gaining a tactical advantage; and, Defendant could not show actual, substantial prejudice based on the pre-indictment

prejudicial; the reason for the delay was the government's negligence in failing to conduct an adequate search for her; that she has timely asserted her right to a speedy trial and did not assert her right earlier because she was not aware of the pending Indictments; and, that the nature of the delay is such that she is not required to show actual prejudice.  In the alternative, she claims that she has demonstrated actual prejudice by the inability to obtain various records that would assist in her defense that she merely agreed to cash refund checks for certain individuals but was not involved in the tax fraud scheme.  At the outset of the hearing, defense counsel also claimed that she was prejudiced because the detainer placed upon her while she was in state custody caused her to remain in state custody rather than post a bond; and, that she had not received good legal advice regarding the effect of the detainer.  This argument was abandoned, however, when the Defendant elected not to testify and present evidence regarding this aspect of prejudice.

The crux of the government's argument is that the pre-indictment delays were reasonable considering when the government learned of Defendant's criminal acts and the time necessary to investigate those crimes before bringing the Indictment; that any unreasonable post-indictment delays were caused by Defendant's concerted effort to evade law enforcement by using disguises and aliases; and, that she did not timely assert her right to a speedy trial, since she did not assert her right until February 2009. Moreover, the government claims that, based upon the extensive discovery it has provided, Defendant cannot establish prejudice resulting from the delay.

---

delay alone (Tr. at 13-14).  References in this Report and Recommendation to the real-time transcript obtained by the undersigned Magistrate Judge are made by using the symbol "Tr."  followed by the page number.  A certified transcript has not yet been filed.

II.    **FINDINGS OF FACT**

An evidentiary hearing was held on February 20, 2009, at which time the government presented the testimony of IRS Special Agents Mary Hammond and Ronald Bryan, as well as the testimony of Department of State Special Agent Vinh Nguyen.  In addition, the government introduced into evidence numerous exhibits which corroborated their testimony and provided details regarding the chronology of the investigations.  The defendant relied upon cross-examination of these witnesses, and presented no testimony.  The defendant introduced three exhibits into evidence to support her claim of prejudice due to her inability to obtain records relevant to her defense.

Based upon a thorough review of the record, including the parties' briefs and the testimony and exhibits introduced at the February 20, 2009 evidentiary hearing, the undersigned makes the following findings of fact, which are undisputed unless otherwise noted.  With respect to the recitation of the evidence the government intends to use to prove the charges, the undersigned does not make any credibility determinations, but recites the evidence to describe the investigation that was undertaken prior to the indictment, and to provide context for the claim of prejudice.

The alleged conduct giving rise to the Indictment in Case No. 04-20136-CR-UNGARO occurred on April 2, 1999, when, according to the Indictment, Defendant Maritza Valiente completed a fraudulent passport application under the name of "Nancy Noemi Nazario" (Case No. 04-20136-CR-UNGARO, DE # 1).

Special Agent Vinh Nguyen of the United States Department of State Diplomatic Security Service ("S/A Nguyen") was assigned to this case in early 2008, and is the current case agent.  He testified that Defendant supported her application with Nancy

5

Nazario's Puerto Rican birth certificate as well as a driver's license issued to Nancy Nazario, which she obtained based on information Valiente received while acting as Ms. Nazario's real estate agent.  Based on this information, S/A Nguyen testified that there was no reason to suspect that the application was fraudulent at the time it was submitted, and, that Defendant was issued a passport in the name of Nancy Nazario.

The State Department did not begin its investigation into Defendant's fraudulent passport application until September 2, 2003, when Nancy Nazario applied for a passport in Boston, Massachusetts, and officials realized that a previous passport had been issued in her name and with her personal information, but with a photograph of a different person. (Tr. at 49-50).  Officials in Boston interviewed Ms. Nazario, who identified the photograph in the earlier passport application as that of Defendant Valiente, who had served as her realtor in Miami and who had obtained Nazario's personal information in that capacity.  To corroborate this claim, agents of the State Department interviewed Nazario's mother and sister, who confirmed the information provided by Nazario (Tr. at 50-51).  A criminal investigation was then opened in Miami, Florida on February 13, 2004 and assigned to Department of State Special Agent Jairo Saravia ("S/A Saravia").

On March 4, 2004, Defendant was indicted for passport fraud and falsely claiming to be a United States citizen in Case No. 04-20136-CR-UNGARO.

The alleged conduct giving rise to the Indictment in Case No. 04-20046-CR-UNGARO relates to Defendant's ownership of United Mortgage Financing, Inc. ("United Mortgage"), and the submission of tax returns on behalf of individuals who sought refunds based upon employment at that company.  According to the Indictment, United Mortgage did not conduct any business activity and did not have any employees.

6

Nevertheless, in the year 2000, 32 individuals filed fraudulent tax returns with the Internal Revenue Service ("IRS") seeking tax refunds based on their claims that United Mortgage withheld taxes from their earnings.[3]  Of the $139,120.00 total disbursements made by the IRS on the basis of the fraudulent tax returns, approximately $37,002.15 allegedly passed through bank accounts in Defendant's name (Case No. 04-20046-CR DE # 3).

The IRS investigation began in May 2000 with information from the fraud detection center of the Internal Revenue Service regarding the fact that 32 tax returns had been filed by persons claiming to work at United Mortgage.  The investigation was assigned to IRS Special Agent Mary Hammond (S/A Hammond).[4]  On July 31, 2000, S/A Hammond interviewed Defendant Valiente, who was accompanied by her attorney, Tim Kincade, Esq., about the alleged tax fraud, and confronted her with the evidence against her.  At that time Defendant claimed that she had only cashed certain refund checks for the taxpayers.

S/A Hammond's investigation took approximately two years and included the execution of two search warrants that were issued in July and September 2000 (DE # 115 at 5 & n.3); and at least 12 interviews of Defendant and her co-defendants, as well as witnesses, including Defendant's mail carrier, between July 2000 and June 2001 (DE # 115 at 5 & n.4).  As part of the investigation, IRS agents also issued summonses in approximately February 2001; Ocean Bank responded in approximately March 2001; and

---

[3]  S/A Hammond testified that she investigated additional allegedly fraudulent tax returns that related to a co-defendant rather than defendant Valiente.

[4]  S/A Hammond's maiden name is Dino, and she is referred to by her maiden name in some of the exhibits that pertain to periods of time prior to her marriage, as well as in some of Defendant's briefs.

Eastern National Bank responded in approximately April 2001 (Tr. at 158-60).  Thereafter, handwriting exemplars were taken from defendant Valiente (Tr. at 115).

S/A Hammond testified that a two-year investigation was not atypically long given the complexity of the case, the number of tax returns that needed to be reviewed and the related acts of fraud by the co-defendants that needed to be investigated.  In fact, S/A Hammond testified, this two-year investigation was the shortest investigation that she has participated in during her nine years with the IRS (Tr. at 117-18).

S/A Hammond testified that the IRS' ordinary policy, and the policy that was followed in this case, was as follows: after the Special Agent prepares a report, it is reviewed by the supervisor; then, it goes through an OCR Review Process; then, it is reviewed by Internal Counsel; then, it is returned to the Special Agent; then it is sent to the Department of Justice Tax Division; and, finally, it is forwarded to the United States Attorney's Office for the purpose of seeking an indictment and handling the prosecution.

During the course of her investigation, on May 2, 2002, S/A Hammond encountered Defendant in the Claude Pepper Federal Building, where S/A Hammond worked.  She testified that Defendant was wearing straight, bleached-blonde hair that appeared to be a wig, and not the dark, wavy hair that she wore when they first met early in the investigation.  S/A Hammond followed Defendant to the bankruptcy floor, where Defendant reviewed files pertaining to a different person.  S/A Hammond testified that it was clear that Defendant recognized her and that she was uncomfortable in her presence (Tr. at 173-76).  Thus, S/A Hammond asked another agent to tail Defendant, and that agent was able to obtain Defendant's vehicle tag number (Tr. at 118-21).  S/A Hammond asked that a flag be placed on the records that Defendant was accessing so that she would be notified if they were accessed again in the future (GX 24) (Tr. at 137-

8

38).

On October 8, 2002, the Special Agent in Charge of the IRS Miami Field Office mailed a letter to Defendant advising her that her case had been referred to the Department of Justice Tax Division with a recommendation that she be prosecuted (DE # 115 at 6) (Tr. at 160-61).  There is no evidence regarding whether defendant Valiente received this letter; and, it is unclear where the IRS obtained the address to which the letter was sent.[5]  The government introduced a series of photographs of Defendant, which show her wearing dark, wavy hair in June 1990 (GX 3 and GX 4), as well as in November 1994 (GX 9) and June 1998 (GX 2); but, with long blonde hair after 1999 (GX 5, GX 6, GX 7 and GX 10).  The government has urged the Court to infer that Defendant was trying to disguise her appearance.  However, the undersigned declines to draw this inference since the evidence regarding when the defendant changed her hair color was vague and appears to have first occurred prior to the commission of the offenses charged.

On January 22, 2004, Defendant and 3 co-defendants were indicted for filing fraudulent tax returns in Case No. 04-20046-CR-UNGARO, and the IRS prepared an Operational Plan to arrest Defendant and her 3 co-defendants.

The Operational Plan provided that agents would attempt to apprehend Defendant at her last-known address; and, if she could not be found there, that the agents would split up and look for her at other possible addresses associated with Defendant (GX 25).

---

[5]  Defendant Valiente did not testify, and therefore did not deny receiving the letter.  There was no return receipt requested with respect to the delivery of the letter.  It is unclear where the IRS obtained the address to which the letter was sent, although S/A Hammond testified that the address seemed familiar to her, and she believed she had seen it somewhere in the file.

On January 28, 2004, law enforcement officials were able to locate and arrest the 3 co-defendants, but could not locate Defendant (Tr. at 122).

After the failed attempt to arrest Defendant, S/A Hammond contacted the automobile dealer that had issued the temporary tag that was seen on her car on May 2, 2002.  Agents visited the dealership which could not provide current contact information for the Defendant, but provided the agents with information regarding the financing corporation.  Although employees at the financing corporation did not have Defendant's contact information used in connection with the purchase of the car, they informed agents that Defendant had turned in her car for repairs and abandoned it (Tr. at 123-24).

Agents searched Defendant's abandoned car and retrieved, among other things, the business card of attorney Juan Gonzalez, whom agents interviewed on two separate occasions.[6]  In addition, S/A Hammond called the attorney who had represented the defendant at her interview in the early stages of the investigation, Mr. Kincade, but was advised that he no longer represented the defendant and had no contact with her.

Throughout January and February 2004, S/A Hammond testified that agents did numerous drive-bys of addresses associated with Defendant in an attempt to locate her (Tr. at 127, 129-30).

In February 2004, S/A Hammond went to Puerto Rico to interview potential witnesses and asked them if they recognized Defendant based on pictures she provided.  Although some of the interviewees recognized Defendant, none of them had information to assist law enforcement officials in locating her (Tr. at 130-32).

State Department S/A Nguyen, the current case agent in the passport fraud case,

---

[6] Special Agent Jairo Saravia, the case agent with respect to the passport fraud case, was present at the second interview (Tr. at 124-25).

testified regarding the efforts made by his predecessor agents to locate Defendant Valiente.  In addition, a case activity log and reports of investigative efforts were introduced at the hearing.

On February 18, 2004, IRS agents requested that Defendant be entered into the NCIC and TECS databases (GX 26).  Thereafter, S/A Hammond placed a "Red Notice" to arrest Defendant if she attempted to cross any United States border.

On February 25, 2004, State Department S/A Saravia sent letters to the Aventura and Hialeah Police Departments, requesting that they provide him with their records and photographs of Defendant (GX 14).

On February 26, 2004, the original case agent in the passport fraud investigation, S/A Saravia, and the original case agent in the tax fraud investigation, S/A Hammond, interviewed Hernando Garavito, Defendant's "common-law" brother-in-law, who had been listed as an emergency contact in the 1999 passport application.[7]  Mr. Garavito identified Defendant and stated that she had defrauded him out of money.  He also told the agent that his brother lived in Colombia with the children he had with Defendant (Tr. at 52).

In addition, in February 2004, agents contacted local schools and made inquiries based on the presumed ages of Defendant's children, but it did not appear that they were registered in schools here (Tr. at 127).

In February 2004, State Department S/A Saravia learned that Defendant used a Post Office Box as a return address when mailing packages to her children in Colombia, and unsuccessfully attempted to use that Post Office Box number to obtain an actual

_____

[7]  This was the second interview of Mr. Garavito conducted by S/A Hammond.

address that he could use to track down Defendant (Tr. at 53-55).

In March 2004, S/A Saravia contacted Juan Gonzalez,[8] an attorney who had represented Defendant in another matter and whose card had been found in the abandoned car, but that attorney had not seen Defendant in approximately 9 months and was not able to provide any additional information (Tr. at 55-56).

In October 2004, S/A Hammond followed up to ensure that Defendant's record was still active in the NCIC and TECS databases (GX 31) (Tr. at 132-33).

On November 8, 2004, after learning that Defendant filed an application for asylum with the Immigration and Naturalization Service ("INS"), S/A Hammond wrote to the INS to request Defendant's case file (GX 27) (Tr. at 133).

S/A Nguyen testified that he was not aware of anyone informing any of Defendant's contacts, including her brother-or-law or her prior attorneys, that Defendant was under indictment during the course of the investigation (Tr. at 103-04). Similarly, S/A Hammond testified that, to her knowledge, when agents contacted individuals associated with Defendant, they identified themselves as law enforcement and were looking for Defendant, but did not specifically say that Defendant was the subject of a pending Indictment (Tr. at 128, 178-79).

In addition, S/A Nguyen testified that, although S/A Saravia obtained the contact information for the Florida State Probation Officer supervising Defendant's probation, there was no indication in the file regarding actual contact with the Probation Officer (Tr. at 104-05). However, S/A Hammond contacted Defendant's probation officer, but the

---

[8] The case activity log refers to interviewing attorney "Rodriguez," but this appears to be a clerical error based upon the testimony of S/A Hammond that the interview was conducted with attorney Gonzalez.

probation officer was unable to provide any contact information for Defendant (Tr. at 168-69).

On January 30, 2005, Department of State agents conducted a final records check before concluding that all leads in the case were exhausted, the subject could not be located and the case was closed administratively (GX 13 at 2).

Beginning on February 10, 2005 at the latest, S/A Hammond conducted periodic National Comprehensive Report searches until April 2006, when she was transferred to the St. Louis Field Office (GX 29) (Tr. at 133-34). The National Comprehensive Report provides all information contained in public databases regarding, addresses, telephone numbers, liens, and assets of a particular person. S/A Hammond printed out one report on February 10, 2005, and thereafter checked updated reports to determine if there was any new information. There was never any new information.

After S/A Hammond was transferred, the case was reassigned to S/A Tablinski. There is no indication of any efforts on the part of S/A Tablinski to locate Defendant Valiente. In October 2006, the tax fraud case was transferred to Special Agent Ronald Bryan. The case was in fugitive status at the time of this transfer, the case file was in the storage warehouse, there were no new leads, and S/A Bryan made no effort to locate Defendant Valiente.

On April 3, 2007, Defendant was arrested by Florida law enforcement officers. At the time of her arrest, Defendant gave a false name, Jessica Romani, and used a false date of birth.

As a result of the information which had been entered into NCIC, the U.S. Marshal's Service was notified of this arrest. On April 12, 2007, the United States Marshal Service ("USMS") advised S/A Bryan that Defendant Valiente was in State

custody and confirmed that a federal detainer was placed on her.  S/A Bryan confirmed that Defendant remained in State custody on October 18, 2007 and March 21, 2008.

Although agents from the Department of State apparently worked with the IRS agents in attempting to locate Defendant Valiente in early 2004, there is no evidence of any independent efforts to locate Defendant Valiente between the records check conducted on January 30, 2005 and August 28, 2007.

On August 28, 2007, Department of State Special Agent Rey ("S/A Rey") conducted an audit of the case file and searched for any new information related to the passport fraud case in the NCIC, TECS and IMS databases.  He learned that the arrest warrant issued with respect to the passport fraud case had never been entered into these databases.  However, as a result of his audit, S/A Rey discovered that Defendant was in State custody.

S/A Nguyen testified that, in accordance with Department of State policy, a federal detainer would have been placed on Defendant as a result of the passport fraud indictment by August 2007 at the latest, but that she was already subject to a federal detainer as a result of the IRS investigation (Tr. at 79-80).

Both state and federal law enforcement agencies were in line to gain custody of Defendant after she was arrested, including the Broward Sheriff's Office, the Florida Department of Law Enforcement, the Department of State and the IRS.

S/A Nguyen testified that Department of State agents "continually" contacted State law enforcement officials to inquire whether Defendant remained in custody; to confirm that the federal detainer was still in place; and to ask when Defendant would be released (Tr. at 77-78, 106).  Specifically, Department of State agents contacted State law enforcement officials regarding Defendant's status on August 30 and 31, 2007;

November 29, 2007; and July 3, 2008.  S/A Nguyen testified that the Department of State

tried to get custody of Defendant as soon as she was released by Miami-Dade County

authorities (Tr. at 77-78).

IRS S/A Bryan testified that he contacted Miami-Dade law enforcement in October

2007 and March 2008 to check Defendant's status (Tr. at 191-92).  These contacts were

with the Florida Department of Corrections facility which housed Defendant Valiente in

Miami-Dade County.

S/A Bryan learned that, on September 12, 2008, Defendant – though she remained

in the custody of Miami-Dade authorities – had been transferred "on loan" to State

authorities in Broward County based on the criminal charges pending against her in that

jurisdiction.  In December 2008, Miami-Dade authorities erroneously advised S/A Bryan

that Defendant Valiente remained "on loan" to Broward County authorities and

confirmed to S/A Bryan that the federal detainer remained in place (Tr . at 192-93).  In

fact, Defendant Valiente was no longer in state custody on that date.  Rather, on

November 5, 2008, she was released to the USMS based upon the detainer, and the

USMS executed Defendant's arrest warrant.

Defendant Valiente made her initial appearance in this Court, regarding both

cases, on November 7, 2008 (Case No. 04-20046-CR-UNGARO, DE # 73; Case No. 04-

20136-CR-UNGARO, DE # 4).  S/A Bryan was not advised of Defendant's arrest until he

received a telephone call from the U.S. Attorney's Office on December 28, 2008.

III.    LEGAL FRAMEWORK FOR ANALYSIS

In *Barker v. Wingo*, 407 U.S. 514 (1972), the United States Supreme Court set forth

a balancing test comprised of the following four factors which must be examined in

determining whether a defendant has been deprived of the Sixth Amendment right to a

speedy trial:  (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant.  Subsequently, in *Doggett v. United States*, 505 U.S. 647 (1992), the Supreme Court reaffirmed the use of this balancing test, but clarified the nature of the inquiry, and set forth a slightly reformulated version of the four criteria: (1) whether the delay before trial was uncommonly long; (2) whether the government or the defendant is more to blame for the delay; (3) whether, in due course, the defendant asserted her right to a speedy trial; and, (4) whether the defendant suffered prejudice as a result of the delay.  505 U.S. at 652.  In *Doggett*, the Supreme Court focused on the fourth factor–prejudice, and the extent to which presumptive prejudice will be sufficient to require dismissal of the indictment.  The Supreme Court held that the lower courts had misapplied the balancing test by giving too much weight to Doggett's inability to specify actual prejudice, and insufficient weight to the cause and length of delay.  Thus, even though the defendant in *Doggett* could not specify any actual prejudice and the delay was the result of mere negligence on the part of the government, the length of delay (8 ½ years) and degree of negligence was so severe that dismissal was required based on the presumed prejudice resulting from the delay.  *Id.* at 658.  The Eleventh Circuit has recognized, however, even after *Doggett*, that unless the first three factors weigh heavily against the government, some actual prejudice must be shown.  *See United States v. Register*, 182 F.3d 820, 827 (11th Cir. 1999).

With regard to the first prong of the analysis, a delay of more than one year between indictment and arrest is, generally speaking, "presumptively prejudicial." However, meeting this threshhold requirement does not alone warrant dismissal of the indictment, but is a part of the mix of relevant facts, and its importance increases with

16

the length of the delay.  *United States v. Ingram*, 446 F.3d 1332, 1336-39 (11th Cir. 2006); *Rashad v. Walsh*, 300 F.3d 27, 34 (1st Cir. 2002).

With respect to the second factor, It is well settled that the government has the duty to bring the defendant to trial and, therefore, "the burden is on the prosecution to explain the cause of the pre-trial delay."  *United States v. Ingram*, 446 F.3d at 1337.  The government can discharge its burden by showing that the defendant "intentionally evade[d] the Government's efforts to bring him to trial," because, in such circumstances, the defendant is responsible for the delay.  *Id.*  However, to establish that the defendant intentionally evaded arrest, the government must establish that the defendant knew of the indictment or arrest warrant and intentionally hid herself from law enforcement agents.  *Id.*

Numerous courts have considered whether delay caused by a defendant's incarceration by another sovereign is attributable to the government.  Where a defendant is serving a sentence in another jurisdiction, the government has an obligation to bring her to trial on pending charges and cannot merely wait until the completion of that sentence.  *Smith v. Hooey*, 393 U.S. 374, 377 (1969); *United States v. Driver*, 462 F.2d 808, 810 n.1 (5th Cir. 1972) (noting that the fact that one sovereign has custody of a defendant does not obviate the requirement that another sovereign authority seek a speedy trial of the defendant).  This fact is recognized by the enactment of the Interstate Agreement on Detainers, which comes into play only where charges are pending against prisoners serving sentences, and was designed "to encourage the expeditious and orderly disposition" of all outstanding charges.  18 U.S.C. App. 2 § 2.

However, where the defendant is in the custody of another sovereign awaiting trial on pending charges, delay attributable to resolution of those charges is not counted

17

against the requesting sovereign.  As recognized by the Court in *United States v. Grimmond*, 137 F.3d 823, (4th Cir. 1998):

> When a defendant violates the laws of several different sovereigns . . . at least one sovereign, and perhaps more, will have to wait its turn at the prosecutorial turnstile.  Simply waiting for another sovereign to finish prosecuting a defendant is without question a valid reason for delay.

137 F.3d at 828.  In reaching this result, the Court noted that "to do otherwise would be to mire the state and federal systems in innumerable opposing writs, to increase inmate transportation back and forth between the state and federal systems with consequent additional safety risks and administrative costs, and generally to throw parallel federal and state prosecutions into confusion and disarray." 137 F.3d at 828 n.4, *quoting United States v. Thomas*, 55 F.3d 144, 150-51 (4th Cir. 1995).  *Accord United States v. Watford*, 468 F.3d 891, 902-04 (6th Cir. 2006) (adopting the rationale of *Thomas* and *Grimmond*, and expressly rejecting the argument that federal authorities should have secured defendant's appearance by writ of *habeas corpus ad prosequendum*, since this would ignore the longstanding principles of comity which recognize the right of a custodial sovereign to resolve its criminal proceedings before relinquishing custody to another jurisdiction); *see also United States v. Beidler*, 417 F. Supp. 608, 617 (M.D. Fla. 1976) (government did not neglect its duty to bring defendant to trial where it lodged a federal detainer, made periodic inquiries, and unsuccessfully attempted to secure custody of defendant through a writ of *habeas corpus ad prosequendum*).

        The burden as to the remaining two factors in the speedy trial inquiry–assertion of the right and prejudice–remains with the defendant.  *See United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996).  With respect to the third factor, the failure to assert the constitutional right to speedy trial is weighed heavily against the defendant. *United*

18

*States v. Twitty*, 107 F.3d 1482 (11th Cir.1997), *citing Doggett*, 505 U.S. at 653.  Of course, failure to assert the right only counts against a defendant if the defendant was aware of the pending indictment.  *Clark*, 83 F.3d at 1353.

If the first three factors "weigh heavily against the Government, the defendant need not show actual prejudice (the fourth factor) to succeed in showing a violation of his right to a speedy trial."  *Ingram*, 446 F.3d at 1336 (citing *Doggett*, 505 U.S. 647).  The Court may only presume prejudice to the defense, however, if "all three of [the *Doggett*] factors weigh heavily against the Government."  *Id.*  Otherwise, the defendant must show actual prejudice in order to prevail.  *See United States v. Vigille*, No. 07-12074, 2008 WL 5158738, at *2 (11th Cir. Dec. 10, 2008) (slip op.).

In determining how heavily to weigh delay caused by government negligence, the Eleventh Circuit has noted that the requirement that the defendant substantiate the existence of prejudice decreases as the period of delay increases. *Clark*, 83 F.3d at 1353 ("the toleration of negligence varies inversely with the length of the delay caused by that negligence").  In *Clark*, the Court held that the outer limits were established by the Supreme Court in *Doggett*, which held that an 8 1/2 year delay caused solely by government negligence was long enough to vitiate the requirement of affirmative proof of particularized prejudice; and, by *Robinson v. Whitley*, 2 F.3d 562 (5th Cir. 1993), which held that a 14 1/2 month delay attributed to the government was not sufficient to obviate the requirement of establishing such prejudice.  Using a balancing test, the Court in *Clark* held that delay of 17 months which was solely attributable to government negligence was not sufficient to support dismissal absent a showing of actual prejudice. The Court then noted that "[a]ctual prejudice can be shown in three ways:  (1) oppressive pretrial incarceration, (2) anxiety and concern of the accused, and (3)

**19**

possibility that the accused's defense will be impaired." *Clark*, 83 F.3d at 1354.   Since

Clark's showing of prejudice was weak, the Court concluded that dismissal was not

appropriate.

IV.    TAX FRAUD PROSECUTION (CASE NO. 08-20046-CR-UNGARO)

The Indictment in Case No. 04-20046-CR-UNGARO alleges that, from January 2000

through July 2000, Defendant participated in a scheme to file false tax returns.

Defendant contends that the Indictment should be dismissed because the almost four-

year delay between her Indictment and initial appearance violate her right to a speedy

trial under the Sixth Amendment and that she suffered prejudice to her defense based on

the loss of evidence in the eight years since the allegedly criminal acts occurred.

At the evidentiary hearing, S/A Hammond explained that the four-year pre-

indictment delay was the result of the complexity of the IRS' investigation into the

allegations of tax fraud related to United Mortgage, which resulted in charges being filed

against Defendant and three additional co-defendants and involved claims filed by 32

separate individuals.  The government's pre-indictment investigation included the

issuance of two search warrants and the issuance of summonses for bank records, as

well as least 12 interviews with Defendant, her eventual co-defendants, and various

witnesses, including Defendant's mail carrier.  Following a two-year investigation, which

S/A Hammond testified was the shortest in her career, S/A Hammond issued her report.

In the two years that followed, in accordance with the IRS' typical procedure in similar

cases, her report was reviewed by her supervisor; it was proofread in the OCR Review

Process; it was reviewed by internal counsel; and, then, it was returned to S/A Hammond

to check the revisions.  The report was then forwarded to the Department of Justice Tax

Division and, finally, it was sent to the United States Attorney's Office for prosecution.

After the Indictment and arrest warrant were issued, the IRS developed an Operational Plan to arrest Defendant and her co-defendants on January 28, 2004. Although all three co-defendants were apprehended, Defendant could not be found.  The government then stepped up its investigation, which included numerous drive-bys of addresses that were associated with Defendant over the next two months.  In addition, S/A Hammond followed-up with the car dealership that issued the temporary license plate that was seen on Defendant's car on May 2, 2002.  The dealership referred government agents to its financing corporation, where agents learned that Defendant had abandoned her car after taking it in for repairs.  After locating the car, agents found the business card of one of Defendant's prior attorneys and interviewed him.  In February 2004, S/A Hammond went to Puerto Rico with pictures of Defendant and asked individuals associated with the case whether they had Defendant's current contact information.  IRS agents also participated in an interview with Defendant's brother-in-law, who provided them with additional information regarding Defendant and her family in Colombia.  They also searched local schools to see if Defendant had enrolled her children there.  That same month, the IRS placed Defendant on the NCIC and TECS databases, and issued a "Red Notice" that alerted border officials to arrest Defendant if she attempted to leave the country.  S/A Hammond then confirmed that Defendant was still listed on the NCIC and TECS databases in October 2004; and, on November 8, 2004, S/A Hammond requested Defendant's INS file after she learned that Defendant had applied for asylum.  When it appeared that all of their leads had been exhausted, the IRS continued its attempts to locate Defendant by conducting periodic searches of the National Comprehensive Report between February 10, 2005 and April 2006.  Thereafter, the case became dormant for approximately one year.

21

On April 12, 2007, because of the alerts that had been issued by the IRS as part of its initial investigation, the IRS was informed by the USMS that Defendant had been arrested by Florida State police, that she was in the custody of Miami-Dade authorities and that a federal detainer had been placed on her.  IRS S/A Bryan thereafter contacted Miami-Dade authorities in October 2007 and March 2008 to attempt to have her transferred to the USMS, but other state and federal agencies, including the U.S. Department of State, the Broward Sheriff's Office and the Florida Department of Law Enforcement, all sought to gain custody over Defendant.  On September 12, 2008, S/A Bryan once again attempted to have Defendant transferred into USMS custody, but learned that she had been transferred to authorities in Broward.  Finally, on November 5, 2008, the USMS executed the arrest warrant on Defendant and she made her initial appearance in this Court two days later, on November 7, 2008.

Based on the four-part *Doggett* test, which is carried out in turn below, the undersigned concludes that Defendant's Sixth Amendment right to a speedy trial was not violated by the government and it is therefore inappropriate to dismiss the Indictment on those grounds.

A.     Length of the Delay

Defendant argues, and the government concedes, that the approximately four year post-indictment delay in this case is "presumptively prejudicial" because it exceeds the one year threshold.  *See Doggett*, 505 U.S. 651-52.  As stated above, the Indictment in this case was returned on January 22, 2004; the USMS arrested Defendant on November 5, 2008; and her initial appearance occurred on November 7, 2008.  Based on these dates, Defendant calculates the post-indictment delay as being 51 months (DE # 109 at 9), while the government calculates it as "four years, nine months, and seventeen days"

**22**

(DE # 115 at 13).  The undersigned notes that "[t]he relevant delay is the time between the date of the indictment and the *trial date*," *United States v. Ingram*, 446 F.3d 1332, 1337 n.3 (11th Cir. 2006) (emphasis added), but these minor variations make no difference.  There is no dispute that the Indictment was based on acts that occurred as early as January 2000; that approximately four years passed before Defendant was indicted for those crimes in 2004; that Defendant's arrest and initial appearance occurred in 2008; and, that her eventual trial will take place in 2009, approximately five years after the Indictments were handed down.  Thus, based on the fact that the length of the delay is approximately five times longer than required to find presumptive prejudice, it is necessary to consider the remaining *Doggett* factors.

>    B.    The Party to Blame for the Delay

The second prong of the *Doggett* test asks whether the government or the defendant is to blame for the delay; and, it represents the crucial inquiry in this case.

It is clear that the government took sufficient steps to attempt to arrest Defendant in January and February 2004, immediately following the issuance of the Indictment on January 22, 2004.  The parties' dispute is thus focused on the adequacy of the government's attempt to locate, arrest and bring Defendant to trial after it had exhausted its most promising leads.

There is no record of any activity between April 2006, and the time that the IRS was notified by the USMS on April 12, 2007, that Defendant had been arrested by State police approximately ten days earlier.

After learning of her arrest, IRS S/A Bryan confirmed with the USMS that Defendant's federal detainer was in place and, on October 18, 2007, and March 21, 2008, he contacted State authorities to confirm that she had not been released without his

23

knowledge.  When he called again on September 12, 2008, he learned that Defendant remained in the custody of the Miami-Dade authorities but had been placed "on loan" to appear in court in Broward County.  The USMS did not execute the arrest warrant until November 5, 2008, after the State concluded its proceedings against her and released her to federal authorities.

### 1.    The Parties' Positions

Defendant emphasizes that, during their investigation prior to her arrest, government agents did not notify any of the individuals it interviewed – including the attorneys that represented her in previous matters and her brother-in-law – that she was under indictment; and, therefore, her counsel implied, Defendant was unaware of the pending indictment and arrest warrant.  Although Defendant elected not to testify at the evidentiary hearing, her counsel argued that the government failed to carry its burden of demonstrating that Defendant was purposely avoiding arrest, rather than simply leading an ordinary life without knowledge of the pending charges against her; and that it was the government's own lack of diligence that caused it to fall short in its efforts to find her.  In this regard, Defendant Valiente claims that after March 2004, the only active steps that the IRS took to locate Defendant were to confirm that her name was still in the NCIC and TECS databases in October 2004; and, to request her INS file in November 2004.  Defendant discounts the efforts taken thereafter, which consisted only of S/A Hammond conducting periodic (and unsuccessful) searches for new information about Defendant on the National Comprehensive Report between February 10, 2005 and April 2006.

Finally, Defendant suggests that the government did not do enough to secure her presence in this Court after federal authorities became aware that she was arrested by

the State police.  Defendant argues that the government should have obtained a writ to have defendant appear to face the federal charges against her, rather than waiting for the State court proceedings to end first.

The government responds that, following its extensive initial investigation, it was reasonable to scale down its efforts to track down Defendant after it had exhausted all of its leads and come up empty-handed.  The government contends that it undertook a responsible and thorough investigation; and that, in the absence of any tips, all it could do was confirm that Defendant was entered on the relevant databases to ensure that the IRS was notified if the Defendant was stopped by any law enforcement or border officials.

Moreover, according to the government, there is sufficient evidence to conclude that Defendant purposely caused the pre-trial delay in this case based on her intentional efforts to evade capture by law enforcement by disguising her appearance and using aliases.  The government points out that, after Defendant became aware that she was under investigation and had been confronted with the evidence that the IRS had compiled against her, S/A Hammond encountered Defendant in the Claude Pepper Federal Building on May 2, 2002, where she observed Defendant wearing what appeared to be a straight, blonde wig to cover her dark, wavy hair.  At the evidentiary hearing, the government introduced photographs that show Defendant wearing dark, wavy hair prior to 1999, and blonde hair near the time that she was interviewed by the IRS concerning the acts that eventually led to the Indictment in this case. Moreover, Defendant was charged in a separate indictment with stealing Nancy Nazario's birth certificate and personal information to obtain a driver's license and passport in her name, which she used to travel to Colombia on at least one occasion in 1999; and, when Defendant was

25

arrested by State police on April 3, 2007, she told them that her name was Jessica Romani.

Thus, according to the government, Defendant's use of an alias, the lack of any public records reflecting her address or telephone number, the fact that a letter advising her of the referral for criminal prosecution was sent to her prior address, and that her prior attorneys and common-law brother-in-law were aware that agents were looking for her–provides ample reason to believe that Defendant deliberately tried to avoid arrest and is therefore to blame for the pretrial delay.

## 2.   Analysis

A review of the cases illustrates the circumstances under which pretrial delay may be attributed to either the government or the defendant.  In *United States v. Doggett*, 505 U.S. 647 (1992), police officers went to the defendant's home to arrest him less than a month after he was indicted, and were told that he had left for Colombia days earlier. They then entered the defendant's name in the TECS database, although some time later it inexplicably disappeared from the system.  Government agents subsequently learned that the defendant was arrested in Panama and made an informal request that the Panamanian authorities "expel" him to the United States at the end of the Panamanian proceedings.  Unbeknownst to law enforcement, the defendant was released and returned the United States, where he lived openly under his own name for six years; and, over the course of those six years, he got married, earned a college degree and held a steady job without running into any further problems with the law.  The record in that case indicated that the government did not make any efforts to track down the defendant during this time.  It was not until the USMS ran a simple credit search on thousands of people with outstanding arrest warrants that they found the defendant and arrested him

26

on the indictment, which was at that point over eight years old.

In *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006), the defendant admitted to a government agent that he falsely stated on a gun application that he was not a convicted felon.  Two years later, the government indicted the defendant and, over the next two years, made only minimal efforts to contact or to arrest the defendant.  In addition to driving by his home and place of employment without getting out of his car, the government agent left messages for the defendant without telling him why he wanted to speak to him.  The defendant returned two of those phone calls and, in a message, even updated his contact information.  When the defendant was finally advised of the pending indictment, he voluntarily surrendered.  The district court found that Ingram had contributed to the delay by changing his cell phone number, disconnecting his home telephone, and failing to respond to messages left for him at his place of employment.  The Eleventh Circuit held that the district court erred in attributing any fault for the delay on Ingram.  Moreover, the Eleventh Circuit noted that the District Court had made no finding regarding whether Ingram had intentionally evaded prosecution, and that, in any event, such a finding was not supported by the record since the defendant had no knowledge of the indictment or arrest warrant or that government officials were seeking his arrest for a crime he admitted to committing 2-4 years earlier; he provided the government additional contact information; he took affirmative steps to contact government officials; and he ultimately voluntarily surrendered when he was advised of the indictment and arrest warrant.  *Id.* at 1336-38.

The undersigned finds that the government's initial efforts to locate and apprehend Defendant in this case were reasonable and diligent, in contrast to the "letharg[ic]" investigation in *Dogget*, 505 U.S. at 653, and the "feeble" investigation in

*Ingram*, 446 F.3d at 1338.  Whereas in *Doggett* where any simple search of the public records in the six years prior to his arrest would have revealed the defendant's location and contact information, Defendant in this case has not identified any actions that the government could have taken, but did not take, in its efforts to apprehend her in January and February 2004.  Indeed, after the government's initial leads were exhausted, they did exactly what the agents in *Doggett* failed to do – namely, confirming that Defendant was entered in the relevant databases for fugitives and running searches on public and private databases to see if any other law enforcement authorities had encountered her or if there was any new information that could be used to track her down.

The record is unclear as to whether Defendant had actual knowledge that she was under indictment but, even assuming that she had no knowledge of the indictment and arrest warrant this is not a case like *Ingram* where the blame falls squarely on the government.

First, the government agents in this case could reasonably believe that it would be futile to leave messages with the individuals that they interviewed in order to attempt to advise Defendant of the indictment.  The attorneys did not have updated contact information for Defendant and they told agents that they had not spoken to Defendant in months; and, when they interviewed Defendant's brother-in-law, he told them that Defendant had defrauded him out of money, and that her children and common-law husband were residing in Colombia.  This case is therefore distinguishable from *Ingram*, where government agents failed to inform the defendant that an indictment had been filed against him and that they were seeking his arrest, despite the fact that they were able to reach him directly, in part because the defendant himself called the agents to update his contact information.  And, when the defendant in *Ingram* was finally informed

of the charges, he turned himself in.

In addition to finding that the government was not negligent in searching for Defendant or intolerably slow in arresting her, the undersigned further finds that Defendant contributed to the pretrial delay in this case by using an alias for the purpose of evading arrest.  *See Ingram*, 446 F.3d at 1337 ("[A] defendant who intentionally evades the Government's efforts to bring him to trial is culpable in causing the delay.").  Defendant chose not to testify at the evidentiary hearing, nor did she offer any reasonable explanation for using the alias "Jessica Romani"; or for abandoning all of the phone numbers and addresses that she had previously been associated with in the years following her knowledge of the government's investigation into allegations that she committed tax fraud.  There is no evidence in the record concerning the whereabouts of Defendant from the date of her Indictment through the date of her arrest under a false identity.  The undersigned recognizes, however, that it is the government's burden to establish the reason for the delay.  In this case, the evidence that Defendant was aware of the pending charges and sought to evade arrest is circumstantial; and, absent the fact that she used a false name when she was arrested on April 3, 2007, would not be sufficient.  However, when the diligent search undertaken by the combined efforts of both agencies is viewed together with Defendant's use of an alias, the undersigned finds that it is sufficient to establish that Defendant Valiente deliberately attempted to evade facing these charges.

Therefore, the undersigned concludes, based on the totality of the circumstances, that Defendant is to blame for the pretrial delay in this case because the government made a thorough effort to arrest Defendant; that Defendant could not be located based on her intentional efforts to evade law enforcement; that Defendant's efforts were

successful, making it impossible for the government to inform her directly of the pending indictment and arrest warrant; and, finally, that the government acted reasonably when it ran out of active leads by ensuring that she appeared on the NCIC and TECS databases, by issuing a "Red Notice" to border officials, and conducting periodic searches for Defendant using public and private databases.

Even if the evidence did not establish that Defendant had deliberately attempted to evade arrest, the undersigned finds that the government was not negligent, or otherwise at fault, for failing to locate her.  Thus, under these circumstances, the delay between her indictment and arrest would be neutral.  *See United States v. Loud Hawk*, 474 U.S. 302, 316 (1986) (holding that, although delay in bringing case to trial was caused by the government's interlocutory appeal, it would not be given "any effective weight" in a speedy trial analysis because there was no "showing of bad faith or dilatory purpose on the government's part."); *United States v. Trueber*, 238 F.3d 79, 89 (1st Cir. 2001) (citing *Loud Hawk* and concluding that delays which were not attributable to acts or omissions on the part of the government should be considered as part of the speedy trial analysis, but "do[ ] not deserve any effective weight" and "do not justify the 'unsatisfactorily severe remedy of dismissal.'").

The undersigned further finds that the government did not violate Defendant's speedy trial rights by declining to interfere in the ongoing State court proceedings against Defendant before executing the arrest warrant on November 5, 2008.  There were numerous state and federal agencies that sought to obtain custody over Defendant after her arrest.  IRS S/A Bryan acted diligently and confirmed that the federal detainer was still in effect, and followed up with State authorities in October 2007, March 2008 and September 2008 in order to check Defendant's status.  As recognized by the courts in

*Grimmond*, *Thomas*, and *Beidler*, *supra*, waiting for another sovereign to finish prosecuting a defendant is a valid reason for delay.  Simply stated, the government acted reasonably by allowing the State proceedings to run their course before executing Defendant's arrest warrant, especially considering the fact that agents remained in contact with State authorities to confirm Defendant's status and to ensure that she would be turned over to the USMS as soon as possible.

      C.    <u>Whether the Defendant Asserted Her Speedy Trial Rights in Due Course</u>

Whether Defendant timely asserted her speedy trial rights in this case (the third factor in the *Doggett* analysis) is closely related to the question of which party is to blame for the pretrial delay (the second *Doggett* factor), discussed above.  This presents a close question in the context of this case, and given that the burden of proving this element of the speedy trial inquiry falls on Defendant, the undersigned finds that this factor tips in favor of the government.  *See United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996).

Defendant states that she filed the instant motion in due course, approximately three months after her initial appearance.  The government, on the other hand, presumes that Defendant "was likely aware, through the arrest and sentencing of her co-defendants and from her interviews with [S/A] Hammond, that the Defendant was the subject of the IRS charges[, and yet,] she never turned herself in to demand a trial" (DE # 115 at 15).  Thus, whether Defendant asserted her right to a speedy trial depends on when she learned of the charges against her – and, specifically, whether she learned about them at or near the time the Indictment was filed on January 22, 2004; or, whether she learned about them at or near the time she was arrested on November 5, 2008.

To be sure, the government did not introduce any direct evidence that Defendant

was aware of the federal indictment or arrest warrant prior to arrest on November 5, 2008.  Nevertheless, as stated previously, there is substantial circumstantial evidence that Defendant was aware – or, at the very least, would have strongly suspected – that charges had been filed against her in connection with the IRS investigation of the fraudulent tax returns submitted by individuals who purported to work for Defendant's sham corporation; and, that Defendant sacrificed her ability to demand a speedy trial by intentionally attempting to evade law enforcement.  Moreover, once the Defendant was aware of the detainer lodged against her,[9] she did nothing to demand a speedy trial until filing the instant motion three months after her initial appearance.[10]  Therefore, the third *Doggett* factor is weighed slightly in favor of the Government.

    D.    <u>Prejudice</u>

A defendant alleging a violation of her Sixth Amendment Speedy Trial rights can do so in one of two ways.  The first is by demonstrating actual prejudice based on the pretrial delay.  Second, if "all three [*Doggett*] factors weigh heavily against the Government," the Court may presume that the defense was prejudiced by the delay and "the defendant need not show actual prejudice (the fourth factor) to succeed in showing a violation of his right to a speedy trial."  *Ingram*, 446 F.3d at 1336 (citing *Doggett*, 505

---

[9]  The undersigned finds that Defendant was aware of the detainer based upon the inference that she would be advised in the ordinary course of being processed in connection with her State court charges, her failure to deny this, and her counsel's initial argument that she was prejudiced by the fact that the detainer prevented her from posting bond on the State charges.

[10]  The undersigned recognizes defense counsel's argument that he wanted to wait until he received discovery and could evaluate the actual prejudice suffered by Defendant before filing his motion; and, that he expressly disclaimed delay that occurred after her appearance in this Court as a basis for relief.  Nevertheless, in determining whether dismissal is appropriate, this delay is a factor that must be weighed against Defendant rather than the government.

U.S. 647).

### 1. Presumptive Prejudice

Based on the analysis set forth above, the undersigned finds that the Defendant has failed to demonstrate that a presumption of prejudice should be applied. Even though the Sixth Amendment Speedy Trial Clause is only *triggered* based on a delay that occurs after the arrest or indictment of a defendant, "once the Court finds that the speedy trial analysis is triggered, it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the government." *Id.* at 1339.[11] Thus, in the present analysis, the undersigned will consider the entire eight year span between the Defendant's allegedly criminal acts and her trial. Even though a

---

[11] In some rare instances, pre-indictment delay alone may be a basis for dismissing an indictment where the defendant can show that his Fifth Amendment Due Process Rights were violated based on the facts (1) that "pre-indictment delay caused him actual substantial prejudice; and (2) that the delay was the product of a deliberate act by the government designed to gain a tactical advantage," even if the indictment is filed within the applicable statute of limitations term. *United States v. Foxman*, 87 F.3d 1220, 1222 (11th Cir. 1996). In this case, it is undisputed that the tax fraud Indictment was brought within the applicable five-year statute of limitations, *see* 18 U.S.C. § 3282; *United States v. Burdix-Dana*, 149 F.3d 741, 742 (7th Cir. 1998); and, it is undisputed that the passport fraud Indictment was brought within the applicable ten-year statute of limitations, *see* 18 U.S.C. § 3291; *United States v. Xu*, No. 2:02-CR-00674-PMP-LRL, 2008 WL 1317943, at *1 (D. Nev. Apr. 10, 2008) (slip op.). Given the incomplete state of the record at the time the motions to dismiss at bar were filed, Defendant included an argument that the Indictments at issue should be dismissed because the pre-indictment delay violated her Fifth Amendment Due Process rights. Based on the additional evidence provided by the government after the motions to dismiss were filed, including the testimony offered at the February 20, 2009 evidentiary hearing, Defendant's counsel responsibly conceded that there was no good faith argument that dismissal was proper based solely on pre-indictment delay (Tr. at 213-14). Thus, the time that passed between the allegedly criminal acts and the filing of the indictment is only relevant insofar as it pertains to the degree of prejudice Defendant suffered for the purpose of a Sixth Amendment analysis. *See Ingram*, 446 F.3d at 1339 ("Only pretrial delay following a person's arrest, charge, or indictment is relevant to whether the Speedy Trial Clause of the Sixth Amendment is triggered. . . . But once the Sixth Amendment's speedy trial analysis is triggered, it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the Government.").

delay of this length is weighty, the passage of time alone is not considered in a vacuum for the purposes of a Sixth Amendment inquiry.

      With this in mind, the undersigned turns to the second *Doggett* factor and concludes that it tips in the government's favor because Defendant is blameworthy for the delay based on the government's reasonable efforts to indict Defendant and bring her to trial in a timely manner, as well as Defendant's efforts to evade arrest by using an alias.

      As discussed above, the third factor – Defendant's timely assertion of her speedy trial rights – also weighs in favor of the government.  The undersigned notes that this is a close question since the evidence is circumstantial that Defendant was aware of the indictment and arrest warrant prior to arrest on State charges in April 2007 following which there was a detainer placed on her.  However, even if she were not aware of the Indictment, the government acted reasonably under the circumstances in its attempts to locate her and thus this factor would at worst be neutral.  *See Martin v. Sec'y, Dept. of Corrections*, 262 Fed. Appx. 990, 995 (11th Cir. 2008) ("Moreover, to the extent all three [speedy trial] factors weighed against the State, they did not do so heavily, and [defendant] had to demonstrate actual prejudice to prevail.").

      Because three previous *Doggett* factors do not weigh heavily in Defendant's favor, as required to impose a presumption of prejudice to the defense, it is therefore necessary to examine whether Defendant suffered actual prejudice based upon the pretrial delay in bringing this case to trial.

      2.      <u>Actual Prejudice</u>

      Defendant has failed to show that the eight year span between the commission of the alleged criminal acts and her trial caused her to suffer actual prejudice.  In her

Motion to Dismiss the Indictment, Defendant argues that she is prejudiced because the bank records that the Government intends to use at trial are illegible; and because she cannot obtain original or legible copies of her potentially exculpatory bank records that were generated prior to 2000 (DE # 109 at 10).

The government responded in its briefs (1) that legible copies of the bank records sought by Defendant would be produced in its supplemental discovery responses (DE # 115 at 17); (2) that Defendant's theory of the case – which paints her as an innocent bystander who simply cashed the checks for employees who did not have bank accounts – is implausible because Defendant was a payee on four of the fraudulently obtained refund checks (DE # 115 at 17); and (3) that, even if the bank records were somewhat exculpatory, they would not undo the testimony of the co-defendants who will establish Defendant's central role in the alleged tax fraud scheme (DE # 115 at 17-18).

Because Defendant's counsel was not given the opportunity to review the government's supplemental discovery that was produced on the eve of the evidentiary hearing, Defendant was permitted to file a Supplemental Memorandum in support of her claim that she suffered actual prejudice as a result of the delays in bringing this case to trial.  Defendant claims in the Supplemental Memorandum that she is prejudiced by her inability to obtain two categories of evidence.  The first category consists of legible copies of cancelled checks evincing withdrawals from Defendant's bank accounts, which Defendant would use to show that she "was merely cashing checks as a favor to the co-defendants for a small fee" rather than "keeping a large enough percentage of the IRS refunds to be considered circumstantial evidence that the Defendant was a member of the conspiracy" (DE # 120 at 2).  The second category of purportedly missing evidence consists of "emails sent to her by both a co-defendant and an unindicted co-conspirator

tending to negate the Defendant's guilt," in addition to "phone records; wire transfer records; records of referral fees paid to her common law husband Jorge Garavito; and business records related to the Government's putative confidential informant, Marta Deus" (DE # 120 at 3).

The government's response to the Supplemental Memorandum first reaffirms that it has produced legible copies of all of the documents that it intends to use in its case-in-chief (DE # 123 at 2).  Second, the government states that the missing evidence regarding withdrawals of money from her bank accounts are irrelevant, so long as the government proves that the proceeds were illegally obtained (DE # 123 at 3).  The government adds that Defendant's theory of how these records would bolster her case is too speculative, since the factfinder at trial could conclude that her willingness to accept a fee in exchange for cashing fraudulent tax refund checks made out to other individuals, who were purportedly employed by a shell corporation she owned, which had its mailing address at her residence, are just as likely to inculpate her as a willing participant in the scheme as they are to exculpate her as a blameless participant who did not know about the fraud but merely cashed fraudulent checks for individuals without bank accounts (DE # 123 at 3).  Finally, the government points out that Defendant did not explain the manner in which the purported emails, phone records, wire transfers, referral fees and business records would specifically help her case; and, that Defendant failed to articulate her position on the matter or describe the content of the evidence that she claims has been lost due to the passage of time (DE # 123 at 3-4).

The undersigned concludes that Defendant has failed to shoulder her burden that the delay in bringing her to trial caused her to suffer actual prejudice.  *See United States v. James*, 183 Fed. Appx. 923, 927 (11th Cir. 2006).  First, Defendant does not dispute that

she has been provided legible copies of the documents that the government intends to use at trial to show that the fraudulently obtained tax refunds were deposited into Defendant's bank account.  Second, the manner in which Defendant spent the allegedly ill-gotten gains of the tax fraud do not vitiate her involvement in the scheme which is supported by the fact that she appears as a payee on four of the checks; that she admitted her involvement in the scheme; and the expected testimony of the co-defendants.  Finally, Defendant's claim that she is no longer able to obtain potentially helpful documents – such as old emails, phone records, wire transfers and referral fees – were supported by nothing more than the statements of counsel and do not constitute evidence sufficient to carry her burden of proof.

Even assuming, however, that there is some slight prejudice resulting from her inability to obtain these records, when all factors are weighed, as described above, the undersigned concludes that Defendant has failed to establish a Constitutional Speedy Trial violation.  While the length of the delay was uncommonly long, Defendant bears the primary responsibility for the delay; the government acted diligently to locate her; Defendant did not timely assert her right to a speedy trial; and any actual prejudice is minimal.  Therefore, the undersigned recommends denial of the motion as to the fax fraud Indictment pending in Case No. 04-20046-CR-UU.

## V.    PASSPORT FRAUD PROSECUTION (CASE NO. 08-20136-CR-UNGARO)

According to the allegations contained in the Indictment filed in Case No. 04-20136-CR-UNGARO, on April 2, 1999, Defendant submitted a fraudulent application to obtain a U.S. Passport by using personal information that she stole from Nancy Nazario, who had hired Defendant in connection with a real estate transaction.

It was not until Nancy Nazario herself applied for a passport on September 2,

2003, that the Department of State realized that Defendant had used her personal information to obtain a fraudulent passport.  On March 4, 2004, approximately six months after the fraud was suspected, a Grand Jury returned the instant Indictment against Defendant.

In early 2004, after the passport fraud Indictment was filed, Department of State agents went to all of Defendant's last known addresses and conducted interviews with people associated with her, including her brother-in-law, Hernando Garavito, on February 26, 2004.  In addition, in February 2004, after learning that Defendant might be sending packages to her children in Colombia, S/A Saravia of the Department of State attempted to determine Defendant's actual address by asking the U.S. Postal Service to trace Defendant by using the P.O. Box that she listed as a return address.  On February 25, 2004, S/A Saravia sent letters to the Aventura and Hialeah Police Departments requesting that they provide any records and photographs of Defendant that they had in their possession.  In March 2004, Department of State agents interviewed an attorney that represented Defendant in a prior, unrelated matter, and that attorney stated that he had not spoken to Defendant in nine months and that he did not have her contact information.

On January 30, 2005, the Department of State conducted its final investigation, at which time it determined that the case should be closed because all leads in the case were exhausted and the subject could not be found (GX 13 at 2).

S/A Nguyen admitted at the evidentiary hearing that the Department of State apparently failed to enter Defendant into NCIC or TECS when the Indictment was filed on March 4, 2004 as well as when the case was closed on January 30, 2005.  S/A Nguyen testified that, based upon Department of State policies, this must have been an

inadvertent error.  According to S/A Nguyen, the only time a warrant is purposely not entered into NCIC is where: (1) there is a concern that the defendant has access to the NCIC database; and (2) agents will immediately apprehend the defendant.  That could not possibly be the case here, because law enforcement officials did not even know Defendant's whereabouts at any point in 2004 or 2005 (Tr. at 90-91).

It was not until August 28, 2007 that S/A Rey of the Department of State conducted a records audit and, based on a criminal records search of NCIC and TECS, discovered that Defendant had been arrested by State police on April 3, 2007. Department of State agents continually communicated with State law enforcement officials, including on August 30, 2007, August 31, 2007, November 29, 2007 and July 3, 2008, for the purpose of confirming that the federal detainer was still in place; to check whether Defendant was still in custody; and to ask when she was expected to be released.  Defendant was arrested by the USMS on November 5, 2008 and she appeared before this Court on November 7, 2008.

A.   Length of the Delay

The five years that have passed since Defendant was indicted for passport fraud exceed the one-year threshold for presuming prejudice based on the length of the post-indictment delay, thus triggering the need to consider the remaining *Doggett* factors in order to determine whether Defendant has established a violation of her Sixth Amendment right to a speedy trial.

39

**B.    The Party to Blame for the Delay**

The undersigned begins by recognizing that, at first glance, the efforts undertaken by the Department of State to arrest Defendant seem to be somewhat less thorough than the IRS' investigation.  Defendant emphasizes that Department of State agents did not adequately question Defendant's State probation officer to determine her whereabouts; as well as the fact that the Department of State failed to issue a lookout for Defendant on the NCIC and TECS databases either at the time that an arrest warrant was issued on March 4, 2004 or at the time that S/A Rey conducted a records audit on January 30, 2005.  These purported shortcomings, however, did not affect the overall delay in arresting Defendant on the passport fraud charges because the IRS was conducting its own, parallel investigation to arrest Defendant in connection with the tax fraud Indictment, and the two agencies were working together to locate her.[12]  The gaps in the Department of State's investigation that are cited by Defendant were filled in by the IRS' investigation, as evidenced by S/A Hammond's testimony that she followed up with Defendant's State probation officer, as well as the evidence showing that the IRS timely entered Defendant into NCIC and TECS and took the steps necessary to confirm that Defendant remained in the system.

Thus, for the same reasons discussed above, in the context of the IRS' efforts to arrest Defendant following the issuance of the Indictment in Case No. 04-20046-CR-UNGARO, including Defendant's use of an alias to attempt to avoid law enforcement

---

[12]  The working relationship is demonstrated by the case activity log of State Department S/A Saravia, which reflects that he contacted IRS S/A Mary Dino (now Hammond) on February 26, 2004 (GX 11); and they interviewed Hernando Garavito jointly on that same day, and that they jointly interviewed an attorney who had represented Defendant in an unrelated matter.

officials, the undersigned finds that the government was not negligent in its effort to locate Defendant between March 4, 2004 and the present, but rather that it was the Defendant's intentional efforts to evade arrest that caused the pretrial delay.

      **C.**      **Whether the Defendant Asserted Her Speedy Trial Rights in Due Course**

The analysis of the third *Doggett* prong set forth above, in the context of the tax fraud Indictment, is equally applicable here, in the context of the passport fraud Indictment.  Defendant failed to rebut the circumstantial evidence that she was aware that there were federal charges and an arrest warrant pending against her, choosing instead to evade arrest; she did not assert her Speedy Trial rights in a timely fashion after becoming aware of the detainer while she was in State custody; and, therefore, the undersigned finds that she did not satisfy her burden of proving that she timely asserted her right to a speedy trial.

      **D.**      **Prejudice**

Since the previous *Doggett* factors do not all weigh heavily in Defendant's favor, it is not appropriate to apply a presumption of prejudice to her defense as a result of the delay in bringing her to trial.  In the absence of presumed prejudice, Defendant admitted in her Supplemental Memorandum that she suffered no actual prejudice in defending the passport fraud allegations as a result of the delay (DE # 120 at 3).  The undersigned notes that, even without this concession, there is nothing in the record evidencing that the defense will be compromised in any way based upon the passage of time between the alleged passport fraud and trial.  Indeed, the ten year statute of limitations for this offense has not yet expired.  *See* 18 U.S.C. § 3291; *United States v. Xu*, No. 2:02-CR-00674-PMP-LRL, 2008 WL 1317943, at *1 (D. Nev. Apr. 10, 2008) (slip op.).  It is, accordingly,

**RECOMMENDED** that Defendant's Motions to Dismiss (Case No. 04-20046-CR-UNGARO, DE # 109; Case No. 20136-CR-UNGARO, DE # 22) be **DENIED**.

The parties will have ten days from the date of service of this Order to file written objections, if any, for consideration by the Honorable Ursula Ungaro, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988), *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993)

**DONE AND SUBMITTED** in chambers in Miami, Florida on March 6, 2009.

_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished to:
The Honorable Ursula Ungaro,
        United States District Judge
All counsel of record

42